Filed 11/7/22  P. v. Reed CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E075783 |
| v. | (Super.Ct.No. RIF1802434) |
| TAIWAN ORRAN REED, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Ronald L. Taylor, Judge.

(Retired judge of the Riverside Super. Ct. assigned by the Chief Justice pursuant to art.

VI, § 6 of the Cal. Const.)  Affirmed.

Fay Arfa, a Law Corporation, and Fay Arfa for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney

General, Charles C. Ragland, Assistant Attorney General, Arlene A. Sevidal and Susan

Elizabeth Miller, Deputy Attorneys General, for Plaintiff and Respondent.

Following a jury trial, defendant and appellant Taiwan Orran Reed was convicted of pimping, pandering, human trafficking, and rape involving two separate victims, A.M. and S.M.  The trial court sentenced him to a determinate term of 21 years four months, plus an indeterminate term of 30 years to life.

On appeal, defendant contends:  (1) the trial court erred in admitting hearsay statements under the forfeiture by wrongdoing doctrine; (2) the court erred in admitting evidence of uncharged offenses and instructing the jury with CALCRIM former No. 1191[1] and No. 1190; (3) the evidence is insufficient to prove rape and human trafficking of A.M.; (4) the prosecutor committed misconduct—or, more aptly, prosecutorial error[2]—by (a) eliciting expert testimony from law enforcement witnesses about the effects of human trafficking and prostitution, (b) cross-examining defense character witnesses with guilt assuming hypotheticals, and (c) improperly vouching for the victims' credibility and by disparaging defense counsel; (5) the court erred in admitting expert testimony to interpret words and analyze data on a prostitute's cell phone; and (6) the cumulative error doctrine applies.  We reject these contentions and affirm.

---

[1]  In March 2017, CALCRIM No. 1191 (evidence of uncharged sex offense) was renumbered as CALCRIM No. 1191A.

[2]  "'[T]he term prosecutorial "misconduct" is somewhat of a misnomer to the extent that it suggests a prosecutor must act with a culpable state of mind.  A more apt description of the transgression is prosecutorial error.'"  (*People v. Centeno* (2014) 60 Cal.4th 659, 666-667.)

2

## I.  PROCEDURAL BACKGROUND AND FACTS

### A.  *The Charges.*

On August 5, 2020, the Riverside County District Attorney's Office filed a second amended information alleging that defendant committed the crimes of pimping (Pen. Code,[3] § 266h, subd. (a) [count 1-A.M.]), pandering (§ 266i, subd. (a) [count 2-A.M.]), human trafficking (§ 236.1, subd. (b) [count 3-A.M.] & § 236.1, subd. (c)(2) [count 6-S.M.]), rape (§ 261, subd. (a)(2) [count 4-A.M., count 7-S.M.]) and robbery (§ 211 [count 5-A.M.]).  A multiple victim enhancement was also alleged.  (§ 667.61, subd. (e)(4).)

### B.  *The Prosecution's Case.*

#### 1.  *Expert testimony.*

Riverside County Sheriff's Deputy Daniel Engels was the prosecution's first witness at trial.  He had spent 14 years as a police officer, including nine years assigned to the human trafficking task force, and a part-time assignment to the Inland Empire Child Exploitation Task Force.  He "received training, both federally and through state law enforcement agencies, on the investigation of human trafficking, pimping, pandering, prostitution, [and] interview techniques with the victims" of pimping and pandering.  He conducts law enforcement training and has investigated over two hundred cases involving pimping and pandering.

---

[3]  Further statutory references are to the Penal Code unless otherwise stated.

Deputy Engels provided the jury with definitions and explanations of terms used by individuals who engage in human trafficking and pimping. He testified to the following: (1) the "'game'" is essentially the life of prostitution; (2) commercial sex buyers are "tricks," "clients," or "johns"; (3) commercial sex workers (CSW) are the prostitutes who engage in sex acts and collect money; (4) a third party pimp or trafficker benefits monetarily from the proceeds of CSWs and is called "'daddy.'" "'Folks'" is another term used to refer to a pimp or trafficker. The deputy defined a "bottom," "bottom girl," or "bottom bitch" as a CSW who works for a pimp and is the most trusted of all the pimp's girls. She trains new girls, obtains hotel rooms, car rentals, and hosts online advertisements so that the pimp's name is not attached to anything that could be used as evidence against him or her. "[K]nocked or chopped" was defined as victims being "assaulted . . . by [their] exploiter." A "'renegade'" is an individual CSW who does not work for a pimp. "'[C]hoosing' or 'choose up'" involves a CSW leaving her current pimp to work for another pimp. A "'square'" is someone who is not willing to engage in sex acts or get into the game, "green" refers to a new girl, and "the life" is another term for the game. A "'blade' or a 'track'" refers to an area or street typically with a lot of businesses or high traffic vehicle volume where the girls engage in street prostitution. A "'circuit'" is destination locations where prostitution is known to occur.

According to Deputy Engels, there are types of pimps, including a "'Romeo' pimp" who recruits or grooms a girl who is new to prostitution through a relationship, i.e., initially dating her, gaining trust, love, and affection, and then introducing her to the "game." In contrast, a "gorilla pimp" is someone who uses physical violence and sexual

4

assault to get victims to engage in sex acts. He also identified a third type of pimp, which is a hybrid of the first two. He explained that a pimp may start as a Romeo but become a gorilla when the victims realize this is not the life they want. In the game, all the "trap" (money) made by CSWs goes to the pimps. If CSWs want to eat or purchase basic care items, they must ask permission to use some of their trap. Pimps withhold permission if CSWs have not made their daily "quota." Also, if a CSW is robbed of her trap, she remains responsible for replacing it. Pimps use tattoos—typically "a moniker, an AKA, a nickname, or . . . a symbol"—on CSWs to show ownership. "304" is a term for "ho," and a "304 tattoo" means the person is "down for prostitution."[4] The lifestyle of pimps and CSWs is transient.

Deputy Engels testified that pimps typically recruit girls who are vulnerable, very young, runaways, have been sexually or physically abused, lack a stable foundation at home, have a connection to social services, lack role models, trust, love, and affection, and have drug or alcohol dependencies. Pimps offer "love, attention, affection, perception of stability or family, . . . enough to get these girls to essentially at least try out prostitution." They recruit through face-to-face and social media. The deputy acknowledged a CSW's ability to run away, but stated that does not usually happen because she believes her pimp loves, cares for, and protects her, or she is afraid of being

---

   **4** Detective Sturdavant was a detective with the Riverside Police Department assigned to the special investigations bureau vice unit to investigate human trafficking and crimes related to commercialized sex. He testified that a 608 refers to being "twice the prostitute of the other ones. They're much more successful . . . . Their hoing abilities are much better than the typical 304, the standard ho."

physically or sexually assaulted. He added that pimps may intentionally impregnate their CSWs and use the children as control mechanisms; a CSW is less likely to disclose her situation and have the father of her child locked up. Pimps also control CSWs by taking their personal documents such as birth certificates, driver's licenses, visas, or green cards. Any girl who cooperates with law enforcement is referred to as a "faggot."

According to Deputy Engels, there are two main rules to the game: bring in all the money and do not talk to law enforcement. When any rule is broken, the bottom girl is the one who is "made an example" by being denied food, sexually assaulted, or physically assaulted in front of the other girls.

### 2. *The charged offenses involving A.M. (counts 1-5).*

In March 2018, A.M. (born 1998) was staying at a sober living facility when she met S. Russell and R. Fulcher.[5] Russell offered A.M. a better life and arranged for her to meet defendant, aka "Daddy," who could offer her a job. A.M. told Russell that she wanted to earn "easy money" while working as an exotic dancer/stripper. After A.M. sent pictures of herself to defendant, he responded, "'Is all that ass for me?'" A.M. texted, "'Yes, baby.'"[6] Text messages were exchanged between Russell and A.M., and arrangements were made for defendant to pick up A.M. from her sober living house. Defendant offered, and A.M. accepted, a position as a dancer and to live at his home.

---

[5] Russell and Fulcher lived with defendant; they entered plea agreements and were released from jail to serve in a human trafficking program.

[6] In her cell phone, A.M. identified defendant's number as, "'boss.'"

6

Upon moving into defendant's home, A.M. gave him her social security card and birth certificate; he helped her get an identification card from the Department of Motor Vehicles. She kept her cell phone, but she did not have any cellular phone service and she did not know the Wi-Fi password. A.M. was instructed on the house rules, including not going outside unless defendant was home or there was a reason to, sleeping in the living room, only going into defendant's bedroom when invited, calling defendant, "Daddy" or "'The Grate,'" and asking his permission to go out to eat, get food, or cook dinner. She was also told to call defendant if she got arrested, but not to say that he was her pimp.

Shortly after moving in, defendant took A.M., Russell, and Fulcher to Los Angeles where A.M. learned how to prostitute by watching Fulcher. After that night, defendant took her to Los Angeles almost every night to perform sex acts for money. She was expected to make a certain amount each night, and she had to work until she reached her quota. She did not feel like she had a choice because she was scared of defendant; he yelled at her and called her a "'sorry bitch.'" She also witnessed him yell at and hit both Russell and Fulcher, and choke Fulcher to the point that she started seizing. He told A.M. that she was lucky because she was new, and he did not hit new girls. A.M. was afraid to talk to law enforcement because she did not want to go to jail or be "on [her] ass[]" if defendant went to jail. Also, Fulcher told her that "snitches get stitches." Defendant wanted A.M. to tattoo herself with "'The Grate Life'" and her "ho name, 'Finesses.'" Fulcher's leg was tattooed with "'The Grate Life'" and her jawline displayed "'304.'"

7

Defendant initiated sexual intercourse with A.M. even though she did not want to do so and told him so. When defendant perceived her lack of enjoyment, he told her to calm down and relax. He said, "'I need to break you in.'" There were other times when he had sexual intercourse with her; if she tried to roll over, he would pull her back. A.M. admitted that she never tried to stop defendant, and she acted as if she enjoyed it even though she did not. She stopped trying to avoid his advances because she was "not trying to get hit."

In April 2018, A.M. told defendant she wanted to leave. To do so, she had to sign over her $890 tax return to defendant. A.M. was afraid to initially report defendant to police. After her trial testimony, she curled in a ball on the floor, cried uncontrollably, and vomited into the trash can.

### 3. The charged offenses involving S.M. (*counts 6-7*).

S.M. testified that she was born in 1992, and defendant became her pimp in 2009 when she was 17 years old. S.M.'s mother was a drug addict, and her father was an alcoholic who physically and sexually abused her. When she was 16 years old, she left home, moved to San Diego, and became a prostitute. She moved back to Riverside, met defendant, and the two began a romantic relationship. Initially, S.M. had consensual sex with defendant but later the sex was nonconsensual. One time, when S.M. told him she did not want to have sex, he pinned her down, choked her, and "just took it." She did not think she could fight him off.

Defendant suggested that S.M. return to working as a prostitute with him in charge. After agreeing to do so, defendant kept her belongings—birth certificate and social

8

security card—and she called him, "Daddy" or "master." He would take her to different locations to work and required her to make at least $500 to $1,000 a night. She had to remain on the street until she made her quota, or she would "get beat," which included getting choked, slapped, or punched. After defendant started to physically abuse her, she did not believe she could tell him "no." One time when she hit back at him, he hit her harder. S.M. did not leave because she had no family, loved defendant, and feared him. She testified that she could not run away from him because he would "sneak up and grab [her] by the throat." He told her that if she ever left him, he would find her and her family and, if she ever testified against him or turned him in, he would kill her and anyone affiliated with her. S.M. remained scared of defendant and continued to suffer from posttraumatic stress syndrome because of his threats.

When defendant was arrested, S.M. left and moved away. A few months later, when she was walking home from school, he snuck up behind her and said, "'I told you I'll always find you.'" She was terrified because she had no idea how he had found her. When S.M. first saw defendant in the courtroom during the preliminary hearing, she started crying and shaking. According to Detective Sturdavant, on the way to the courthouse, S.M. was visibly "distraught, upset, began crying and having difficulty breathing." During a break in her testimony, she was "seated in the corner with her face buried in her hands, sobbing uncontrollably, borderline hyperventilating, and seeming very distraught." Neither S.M. nor A.M. knew each other.

9

### 4. *Defendant's prior uncharged offenses involving M.T.*

Detective Sturdavant has investigated more than 150 human trafficking cases and has over 120 hours of advanced officer training specifically related to human trafficking and commercialized sex. He was present when Deputy Engels testified, had similar training as Deputy Engels, confirmed the terminology used in the prostitution industry, and defined the responsibility of the players in the game. Detective Sturdavant interviewed M.T. in April and August 2019. According to the interview, the detective learned that in 2008, M.T. met defendant and the two began dating.[7] She soon discovered that he was a pimp, and he convinced her to engage in prostitution to help with his money problems. He taught her everything about "the game." He took her to Los Angeles, Long Beach, Compton, Orange, and Riverside Counties to work. As time went on, defendant became increasingly violent and demanding; M.T. had to work each day until she made her quota of $500. If she did not come home with enough money, he became a "monster." When she was robbed of her earnings defendant beat her. She never left him because she was terrified of him and his family's gang connections. Soon defendant started demanding that she make $700; he would tell her, "'Rain, sleet, shit or snow, I'm gonna get some money from a ho.'" She became his "'bottom bitch'" and recruited other prostitutes to work for him. Defendant regularly beat M.T., put a knife to her throat, and told her that he would cut her face so badly that no one would recognize

---

[7] M.T. was deemed unavailable to testify, and her audiotaped phone conversation with police was played for the jury.

her.  At one point, defendant partnered with another pimp who taught M.T. how to prostitute off the Internet.

In 2011, M.T. left defendant after he beat her to the point where she became unconscious.  She went to the hospital, and the police were called.  Shortly thereafter she left California and never saw defendant again.  She remained "terrified" of defendant.

5. *Evidence of defendant's status as a pimp and further expert testimony.*

Detective Sturdavant searched defendant's apartment.  A picture of defendant hung on the wall with the caption:  "'Get Money Like a Boss'" and "'The Grate.'"  "'The Grate'" was consistent with defendant's pimp name and a tattoo on Fulcher's leg.  In other pictures, defendant is wearing a hat that said, "'Mr. Most Hate,'" wearing a necklace with a gold dollar bill, gold rings, or a belt buckle depicting a $100 bill.  In the closet were a pair of pants and a jacket with dollar signs and a photograph of defendant wearing both.  The detective also found a stack of cellular phones, two $100 bills laminated and displayed with the saying, "'Get money like a boss, The Grate,'" and a hat with dollar signs and the name, "'Mr. Most Hate.'"  The detective also found a citation for loitering for the purposes of prostitution issued to Russell, her California identification card, her social security card, a court printout for loitering (prostitution) bearing Fulcher's name, and her social security card; Russell was not living with defendant at the time of the search.  The detective also searched defendant's car and observed the dashboard cover which was embroidered with the phrase, "'The Grate Life,'" and dollar signs.  A search of Fulcher's telephone revealed a message from

11

defendant that he was "knocking" or recruiting another woman to work for him as a pimp.

Detective Sturdavant testified that, based on his training and experience, in addition to A.M.'s statements, the items and symbols found in defendant's apartment are consistent with "people who identify themselves as pimps, such as flashy jewelry, showy clothing, things that glorify their pimp status" because, in the pimping culture, money is "everything." He also testified that it is common in the game for a CSW to save a pimp's phone number under a term of endearment—boyfriend—and icons or symbols depicting money. The detective noted a recent trend where CSWs "change up the way they save a pimp's phone number to further insulate their pimp, because they know that law enforcement is aware that 'daddy' is a common term. So it will be something [like] 'husband,' 'hubby,' 'my better half,' . . . or something to that effect simulating a relationship." He opined that the more trusted a CSW is to a pimp, the more endearing her phone reference to him. A.M.'s phone had defendant's number saved as "boss," while Fulcher saved it as "my better half." The detective identified a February 2018 social media video made and posted by Russell and Fulcher that glamorized prostitution. The video was filmed in defendant's apartment. Using cell phone service provider data, he established an association between Fulcher and defendant by showing that they traveled together.

Detective Sturdavant observed defendant's tattoos. One tattoo indicated "200 percent," which, according to M.T., referred to his expectation that his girls be 200 percent loyal. Another tattoo said, "'bitches love me,'" "in reference to how he feels

12

he does as a pimp, that women love him and enjoy working for him as a pimp." A third tattoo says, "'loyal to money,'" which is significant because in the pimping culture, "money is everything."

### C. The Defense.

J.H., a coworker, had known defendant for more than four years and considered defendant to be honest and nonviolent. L.R., defendant's sister, knew M.T. because she attended family functions. She also knew S.M. because she would drive S.M. and defendant to work. A.F. lived in defendant's apartment complex and stayed with defendant for a month in 2017. While living with defendant, A.F. never saw anything that suggested defendant was involved in prostitution. E.H. was defendant's ex-girlfriend. She dated defendant "about 16 years ago," he was her daughter's "godparent," and she did not consider him to be violent.

### D. Rebuttal.

The parties stipulated that on February 12, 2012, defendant pled guilty to domestic violence, a felony, in Riverside Superior Court; M.T. was the victim.

### E. The Jury's Verdict.

The jury found defendant guilty of pimping (count 1-A.M.), pandering (count 2-A.M.), one count of human trafficking (count 3-A.M.), and two counts of rape (count 4-A.M. & count 7-S.M.). The jury found him not guilty of robbery (count 5-A.M.) and hung on one count of human trafficking (count 6-S.M.), which was later dismissed.

13

## II. DISCUSSION

*A. Admission of M.T.'s Statements Under Evidence Code Section 1390.*

Defendant contends the trial court prejudicially erred by determining that M.T.'s out-of-court statements to Detective Sturdavant were admissible under the forfeiture-by-wrongdoing exception to the confrontation clause. We find no error.

*1. Further background information.*

a. Defendant's prior acts of violence against M.T.

On November 15, 2011, M.T. was in the kitchen, and defendant began arguing with her, ultimately striking her in the face numerous times with a closed fist. She fell to the floor and laid motionless until defendant left. M.T. was taken to the hospital, and the police were called. She told Riverside Police Officers Moulton and Barrette that defendant was her pimp, who forced her to make money for him through prostitution. She was reluctant to press charges because she feared him and his family, and he had threatened her with violence. Following this incident, M.T. left California to get away from defendant and refused to cooperate with the district attorney's office after charges[8] were filed. Defendant was arrested and pled guilty to felony domestic violence. (Pen. Code, § 273.5.)

---

[8] The district attorney charged defendant with violating sections 273.5, 1192.7, subdivision (c)(8), and 12022.7, subdivision (e).

b. Prosecution's contact with M.T.

On April 26, 2019, Detective Sturdavant spoke with M.T., who described her relationship with defendant and agreed to testify against him. Defendant introduced her to prostitution and told her that if she gets arrested, do not call him from jail or tell anyone that he is her boyfriend. Nonetheless she was instructed to call him "Daddy" and not come home with anything less than $500. Defendant told her that he was "'always gonna be a pimp,'" and she was his "'bottom bitch.'" She stayed with him for four years. He threatened to kill her if she ever left him.

M.T. told Detective Sturdavant that after defendant assaulted her in 2011, she left him and stayed at a shelter for a few months to heal. During this time, defendant and his family threatened her to stop her from pressing charges against him. His family was in possession of "a bag of [her] valuable goods, [her] daughter's baby book with her . . . baby's footprints in it, [the] umbilical cord and, . . . her baby's ultra-sound pictures." Because of their threats and her fear of defendant, M.T. dropped the charges and left California. She initially told the detective that she would testify against defendant so she could "look him in the eyes." However, when the detective spoke with her in August 2019, she stated that she did not want to speak to defense counsel, she feared defendant, and she feared retaliation by his family if she testified in this case.

In March 2020, because of the national state of emergency due to the spread of Covid-19, all trials were suspended and continued. On July 22, 2020, an investigator for the Dallas County District Attorney's Office attempted to serve M.T. with an out-of-state subpoena for defendant's current case. She talked to the investigator over the phone and

15

indicated several times that she was not going to California to testify because defendant was a "'killer,'" and she was "'deathly afraid of him.'" On July 23, 2020, M.T. confirmed her position in a text message to the investigator. That same day, Detective Sturdavant spoke with her, and she immediately stated that she no longer wanted to testify and did not want to talk about it. She stated that she was still "'terrified'" of defendant and feared retaliation if she cooperated with law enforcement by testifying. M.T. explained that she had received threats from defendant's family members in 2012, defendant had threatened her in the past and physically assaulted her on numerous occasions, and defendant had threatened physical violence toward her if she ever cooperated with law enforcement against him. She insisted that she be left alone and reiterated her refusal to testify against defendant because she felt her life would be in danger. M.T. never stated that defendant or his family had contacted her in 2019 or 2020.

c. Prosecution's motion to admit M.T.'s statements.

On July 28, 2020, the prosecution moved to admit M.T.'s statements to Detective Sturdavant on the grounds defendant's acts of dissuading her from testifying forfeited his Sixth Amendment right to cross-exam her. The prosecution argued that M.T.'s

16

statements were admissible pursuant to Evidence Code section 1390,[9] which codified the forfeiture by wrongdoing doctrine. Defense counsel objected and argued that M.T.'s fear of defendant was based on events that had occurred in 2011, there is no evidence defendant engaged in any wrongdoing, M.T. is an "uncooperative witness, . . . not unavailable," and the prosecutor had not been "diligent in efforts to subpoena her." In response, the prosecutor referenced *Giles v. California* (2008) 554 U.S. 353 (*Giles*), and argued that defendant's earlier abuse or threats of abuse, while M.T. was "under his thumb," are relevant because they deterred her from cooperating with law enforcement. He offered independent corroborating testimony from other victims, S.M. and A.M. Regarding his failure to serve M.T. with a subpoena, the prosecutor described his attempts, albeit unsuccessful, to serve her with an out-of-state subpoena, but she was a victim of human trafficking who had been harassed, was fearful, and was living in a state

---

[9] The forfeiture-by-wrongdoing exception to the hearsay rule was codified in Evidence Code section 1390, which provides: "(a) Evidence of a statement is not made inadmissible by the hearsay rule if the statement is offered against *a party that has engaged, or aided and abetted, in the wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness*. [¶] (b)(1) The party seeking to introduce a statement pursuant to subdivision (a) shall establish, by a preponderance of the evidence, that the elements of subdivision (a) have been met at a foundational hearing. [¶] (2) The hearsay evidence that is the subject of the foundational hearing is admissible at the foundational hearing. However, a finding that the elements of subdivision (a) have been met shall not be based solely on the unconfronted hearsay statement of the unavailable declarant, and shall be supported by independent corroborative evidence. [¶] (3) The foundational hearing shall be conducted outside the presence of the jury. However, if the hearing is conducted after a jury trial has begun, the judge presiding at the hearing may consider evidence already presented to the jury in deciding whether the elements of subdivision (a) have been met. [¶] (4) In deciding whether or not to admit the statement, the judge may take into account whether it is trustworthy and reliable." (Italics added.)

that was a pandemic hotspot. The trial court agreed that due to the Covid-19 pandemic flying from Texas to California would not be a good idea. Defense counsel maintained that the forfeiture doctrine applies "[w]hen the person is murdered, not when the person just doesn't want to cooperate, doesn't want to testify." Both parties filed supplemental briefs.

On July 31, 2020, the trial court held an Evidence Code section 402 hearing regarding the admission of M.T.'s out-of-court statements. Detective Sturdavant testified that the other victims, A.M. and S.M. (neither of whom knew M.T.), stated that defendant had instructed them to never cooperate with law enforcement or he would engage in physical violence toward them and their family members. According to S.M., defendant told her, "'If anybody comes asking questions or if [she] was to ever testify, if [she] was to ever turn him in for anything, he would not only kill [her] but he would kill anybody that's around and that's affiliated with [her] family.'" The detective testified about his April 2019 conversation with M.T., during which she acknowledged her domestic violence charge against defendant in 2012, his threat to "come after her and physically harm her or any of her loved ones" if she cooperated with law enforcement, his family's threats to "come after her" if she did not drop the charges, and her "fear for her life." M.T. stated that she was still terrified of defendant, and she moved out of California to "hide" from him. When the detective spoke to her in August 2019, she stated that she did not want to talk to defense counsel because "she felt like it was a trap" and "they were trying to intimidate or dissuade her from cooperating with this investigation and testifying against [defendant]." She remained "very much terrified" of defendant and

18

what he was "capable of" doing. She believed that if she testified against him, he would retaliate against her through "any means necessary."

Detective Sturdavant also testified about his conversation with M.T. on July 23, 2020, when she stated that she was not willing to cooperate and was "adamant that she be left alone." She explained that she was "terrified" that if she came to California and testified against defendant, then he would retaliate against her or her family or children. She recalled the 2011 domestic violence incident when his family "reached out to her and intimidated her and coerced her to drop charges against [defendant]." She stated that "if they were able to reach out to her then, she felt the same thing would happen again." The detective opined that he could do nothing to change her mind because she was angry and frustrated from the attempts to get her to cooperate, and she felt fear, panic, and anxiety as to what would happen to her if she did. On cross-examination, he acknowledged that M.T. never told him that defendant or his family ever contacted her in 2018, 2019 or 2020.

The prosecution introduced e-mail and text communications with the Dallas County District Attorney's Office to and from M.T. concerning their attempts to serve her with a subpoena.

After finding by a preponderance of the evidence that M.T. was unavailable because of defendant's wrongdoing, the trial court admitted her recorded statements to the police about defendant, along with her statements to Detective Sturdavant and Officer Moulton about her reasons for not wanting to testify.

19

## 2. *Applicable legal principles.*

"A criminal defendant has a Sixth Amendment right 'to be confronted with the witnesses against him.' [Citation.] A court may not admit a witness's testimonial hearsay statements against a defendant unless the witness is unavailable and the defendant had a prior opportunity for cross-examination. [Citation.] Nonetheless, in narrow circumstances a defendant may forfeit his right to confrontation by his own wrongdoing. [Citations.] '[W]hen defendants seek to undermine the judicial process by procuring or coercing silence from witnesses and victims, the Sixth Amendment does not require courts to acquiesce. While defendants have no duty to assist the State in proving their guilt, they *do* have the duty to refrain from acting in ways that destroy the integrity of the criminal-trial system.' [Citation.] For the forfeiture-by-wrongdoing exception to apply, a defendant must have engaged in wrongful conduct *designed* to prevent a witness from testifying. [Citation.] Said differently, a defendant must 'engag[e] in wrongdoing that renders the declarant unavailable with an intent to prevent that declarant's in-court testimony.' [Citation.]

"'[W]rongdoing' need not rise to the level of murder. [Citation.] 'The common-law forfeiture rule was aimed at removing the otherwise powerful incentive for defendants to intimidate, bribe, and kill the witnesses against them—in other words, it is grounded in "the ability of courts to protect the integrity of their proceedings."' [Citation.] Thus in [*People v.*] *Jones* [(2012) 207 Cal.App.4th 1392, 1398-1399], the defendant forfeited his right to confrontation when during phone calls from jail he dissuaded his ex-girlfriend

20

from testifying by implying he had friends on the outside available to do '"whatever [was] necessary."'" (*People v. Merchant* (2019) 40 Cal.App.5th 1179, 1185.)

"In general, '[w]e review claims regarding a trial court's ruling on the admissibility of evidence for abuse of discretion.' [Citation.] However, when the admission of evidence 'depend[s] on a determination of preliminary facts by the trial court[,] such determinations will be upheld if supported by substantial evidence.' [Citation.] Thus in this case, where the central disputed issue is whether the trial court erred in finding that a defendant engaged in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness, we apply a substantial evidence standard in reviewing the trial court's finding regarding the defendant's intent. [Citations.] Although we apply a substantial evidence standard of review to the trial court's factual finding, '[w]e review for abuse of discretion the ultimate decision whether to admit the evidence.'" (*People v. Quintanilla* (2020) 45 Cal.App.5th 1039, 1049-1050.)

### 3. *Analysis.*

Defendant contends the trial court abused its discretion in admitting M.T.'s out-of-court statements because the evidence fails to show that he committed any wrongdoing to make her unavailable. He claims that any wrongdoing must involve his pending case. (*People v. Kerley* (2018) 23 Cal.App.5th 513, 559; *People v. Quintanilla*, *supra*, 45 Cal.App.5th at p. 1055.) As we explain, we reject this contention.

To begin with, the evidence shows that defendant created an environment that by its very nature was threatening to anyone who challenged his control and authority. Defendant terrorized M.T. for years by bullying and beating her, retaining possession of

21

her important, personal, family items, and deterring her from talking to the police. Also, defendant engaged in passive coercion (*People v. Merchant*, *supra*, 40 Cal.App.5th at p. 1186) by having his family make threatening calls to her after she reported his assault which prompted the filing of domestic violence charges. Because of these threats, M.T. dropped the charges, refused to cooperate with law enforcement, and moved out of state. Despite the passage of seven years, M.T. remained deathly afraid that defendant and his family "would retaliate against her through any means necessary." The fact that these threats occurred prior to 2019 is irrelevant, given her sustained fear and motivation to not testify against defendant. "Acts of domestic violence often are intended to dissuade a victim from resorting to outside help, and include conduct designed to prevent testimony to police officers or cooperation in criminal prosecutions. . . . Earlier abuse, or threats of abuse, intended to dissuade the victim from resorting to outside help would be highly relevant to this inquiry, as would evidence of ongoing criminal proceedings at which the victim would have been expected to testify." (*Giles*, *supra*, 554 U.S. at p. 377.)

Nonetheless, defendant contends that because neither he nor his family made any threats to M.T. regarding her testimony in his current case, the forfeiture by wrongdoing doctrine does not apply. This interpretation of the doctrine is too narrow. "The common-law forfeiture rule was aimed at removing the otherwise powerful incentive for defendants to intimidate, bribe, and kill the witnesses against them—in other words, it is grounded in 'the ability of courts to protect the integrity of their proceedings.'" (*Giles*, *supra*, 554 U.S. 353 at p. 374, citing *Davis v. Washington* (2006) 547 U.S. 813, 834 (*Davis*).) "[O]ne who obtains the absence of a witness by wrongdoing," whatever the

22

nature of the wrongdoing, "forfeits the constitutional right to confront[]" that witness. (*Davis*, at p. 833.) "Whether a defendant's conduct constitutes 'wrongdoing' depends not necessarily on its character, but on the defendant's intent and whether his actions caused the witness not to appear." (*People v. Reneaux* (2020) 50 Cal.App.5th 852, 868.) Thus, "wrongdoing" does not require the killing of a victim or a nonvictim witness. (*People v. Jones* (2012) 207 Cal.App.4th 1392, 1399.) Rather, it may include threats, intimidation, bribery, and "cajoling but nonthreatening behavior" so long as the defendant intended the witness be made unavailable to testify. (*Reneaux*, at pp. 867, 868-869.)

Here, M.T. never provided testimony against defendant in 2012 because he "acted with the intent to interfere with the court's truth-finding function and his action caused [her] not to appear." (*Reneaux*, *supra*, 50 Cal.App.5th at p. 870.) The Supreme Court has acknowledged that domestic violence victims are "notoriously susceptible to intimidation or coercion" by their abuser to prevent them from testifying at trial. (*Davis*, *supra*, 547 U.S. at p. 833; see *Giles*, *supra*, 554 U.S. at p. 377 ["[a]cts of domestic violence often are intended to dissuade a victim from resorting to outside help, and include conduct designed to prevent testimony to police officers or cooperation in criminal prosecutions."].) By creating an environment that intimidated women into a code of silence, defendant continued to prevent M.T. from testifying against him. Both A.M. and S.M. confirmed defendant's use of intimidation and threats that there would be consequences including physical violence and death to them and anyone affiliated with them if they ever cooperated with law enforcement.

Accordingly, substantial evidence supports the trial court's findings that defendant successfully deterred M.T. from coming to court. It is apparent that he intended to create, and succeeded in creating an environment of intimidation designed to prevent his "girls" from ever testifying against him. Because defendant's wrongdoing caused her to be unavailable at trial, the court did not err in admitting her statements to the police.

*B. Instructional Error: Evidence of Uncharged Sex Offense.*

In addition to finding M.T.'s testimony admissible under the forfeiture-by-wrongdoing doctrine, the trial court also admitted it as evidence of an uncharged sexual offense. The court instructed the jury with CALCRIM former No. 1191, which provided: "The People presented *evidence that the defendant committed the crime of human trafficking against Jane Doe* (*M.T.*) that was not charged in this case. This crime is defined for you in these instructions." (Italics added.) Defendant contends the court "abused its discretion by concluding that [his] conduct with M.T. constituted [an] Evidence Code [section] 1108 'sexual offense,' namely sex trafficking, because [he] did not sex traffic M.T." Moreover, he contends prejudice resulted when the court identified "sex trafficking" as the uncharged sex offense in CALCRIM former No. 1191, and the prosecution used M.T.'s testimony to prove that he trafficked, pimped, and used violence against A.M. and S.M. We conclude the court properly exercised its discretion in admitting the evidence and instructing the jury.

*1. Further background information.*

Before trial, the prosecution moved to admit evidence of defendant's prior sexual offenses and domestic violence against M.T. under Evidence Code section 1108. Defense

24

counsel objected on the grounds the prior offenses did not constitute sexual trafficking as set forth in the statute, it would create a trial within a trial, and require an undue consumption of time. The prosecutor responded that "when you engage in pimping and pandering, you use force, violence, duress, fear, that's human trafficking under [Penal Code section] 236.l[, subdivision] (b)." After considering the parties' arguments, the trial court found that defendant's prior acts of sexual misconduct fell within the parameters of Evidence Code section 1108, subdivision (a), and explained that the uncharged conduct was substantially similar to the charged offenses, not remote, would not require an undue consumption of time, was no more inflammatory than the evidence the jury was going to receive, and was more probative than prejudicial.[10]

M.T. testified via Detective Sturdavant's April 26, 2019 audio recorded interview; she did not appear in court. The jury was instructed with CALCRIM former No. 1191 (evidence of uncharged sex offense) as follows: "The People presented evidence that the defendant committed the crime of human trafficking against Jane Doe (M.T.) that was not charged in this case. This crime is defined for you in these instructions. [¶] You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged offense. Proof by a preponderance of the evidence is different—a different burden of proof from proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it's more likely than not that that fact is true. [¶] . . . [¶] If the People have

---

[10] The prosecutor sought to admit evidence of another victim, A.E., under Evidence Code section 1108. However, he never presented her testimony.

not met this burden of proof, you must disregard that evidence entirely.  [¶]  If you decide that the defendant committed the uncharged offense, you may, but are not required to, conclude from the evidence that the defendant was disposed or inclined to commit sexual offenses, and based upon that decision, also conclude that the defendant was likely to commit and did commit human trafficking against Jane Doe (A.M.) and Jane Doe (S.M.), as charged here.  If you conclude that the defendant committed the uncharged offense, that conclusion is only one factor to consider with all the other evidence.  It is not sufficient by itself to prove that the defendant is guilty of human trafficking against Jane Doe (A.M.) and Jane Doe (S.M.).  The People must still prove each charge beyond a reasonable doubt."  Defense counsel raised no objection to this instruction.

   *2. Analysis.*

    a.  The trial court did not abuse its discretion in admitting evidence of defendant's uncharged sex offenses involving M.T.

  The Legislature has created certain exceptions to the general proscription against admitting character evidence, or evidence of a propensity or disposition to engage in a type of conduct, in cases involving sexual offenses (Evid. Code, § 1108, subd. (a)) and domestic violence (*id.*, § 1109, subd. (a)(1)), subject to balancing under Evidence Code section 352.  To be admissible under Evidence Code section 352 the evidence's probative value must not be "substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  "We apply the deferential

26

abuse of discretion standard when reviewing a trial court's ruling under Evidence Code section 352." (*People v. Kipp* (2001) 26 Cal.4th 1100, 1121.)

According to defendant, the trial court abused its discretion by concluding his conduct with M.T. constituted sex trafficking. He argues the evidence shows that M.T. voluntarily worked as a prostitute, and he never kept her dependent on him. We disagree. Here, the prosecution was tasked with proving that A.M. and S.M. were the victims of sex trafficking. M.T.'s testimony regarding defendant's prior involvement with prostitution and pimping was relevant to establishing the intent behind his actions with A.M. and S.M. M.T. described her relationship with defendant, how it went from romantic to prostitute/pimp, his demand that she earn a minimum daily amount, his anger and assaultive behavior when she did not, his threats to keep her from talking to law enforcement about their prostitute/pimp relationship, and his retention of personal items to control her. The fact that she pumped and paid for the gas in defendant's car, or took care of him, does not show that she kept defendant "dependent on her." Rather, it provides additional evidence that she was his "'bottom bitch,'" who did what he told her to do.

The probative value of M.T.'s testimony lies in her description of an environment of physical and psychological abuse wherein defendant controlled the women and their daily lives. His familiarity with pimping and his treatment of M.T. makes it more likely that he committed the offenses against S.M. and A.M. (See Evid. Code, § 1108; see also *People v. Williams* (2016) 1 Cal.5th 1166, 1196-1197 [Evid. Code § 1108 permits evidence admitted to show propensity].) Moreover, this evidence was more probative

27

than prejudicial because the crimes in the instant case are the same as those involving M.T., and defendant's commission of the same crimes several years earlier shows that he has a long history of pimping. (Evid. Code, § 352.)

b. The trial court properly instructed the jury with CALCRIM former No. 1191.

Defendant contends prejudice resulted when the trial court identified "'sex trafficking'" as the uncharged sex offense in CALCRIM former No. 1191, and the prosecution used M.T.'s testimony to prove that he trafficked, pimped, and used violence against A.M. and S.M.

Although defendant asserts that sex trafficking was not listed as a sex offense under Evidence Code section 1108 until 2017 (Stats. 2017, ch. 805, § 1, eff. Jan. 1, 2018) when the Legislature amended the law with Senate Bill No. 230 (2017-2018 Reg. Sess.), he offers no argument as to why this exclusion contributed to the alleged prejudice that he faced by instructing the jury with CALCRIM former No. 1191. Given Evidence Code section 1108, subdivision (d)'s definition of "'[s]exual offense,'" we perceive no issue with the delayed inclusion of Penal Code section 236.1, subdivisions (b) and (c), because Evidence Code section 1108 allows the trial court to admit evidence of uncharged sexual offenses from any witness subject to Evidence Code section 352. (See *People v. Ennis* (2010) 190 Cal.App.4th 721, 733 [upholding trial court's ruling under Evid. Code § 352, that evidence of uncharged crimes from the same witness who testified to charged crimes is admissible].) In this case, the trial court complied with the statute and instructed the jury with CALCRIM former No. 1191.

28

Nor do we perceive any violation of due process or prejudice from the prosecution's use of M.T.'s testimony of defendant's uncharged sexual offenses to corroborate the victims' testimony of the charged sexual offenses. (*People v. Gonzales* (2017) 16 Cal.App.5th 494, 502 [CALCRIM former No. 1191 does not lower prosecution's burden of proof].) Victims are allowed to support their testimony with testimony of uncharged sexual offenses. CALCRIM former No. 1191, as given here, correctly stated the law regarding the jury's use of evidence of an uncharged sexual offense. (See *People v. Reliford* (2003) 29 Cal.4th 1007, 1011-1016 [rejecting a similar challenge to CALJIC No. 2.50.01, an instruction based on Evid. Code § 1108]; *People v. Cromp* (2007) 153 Cal.App.4th 476, 480 [CALCRIM former No. 1191 is not materially different from CALJIC No. 2.50.01; defendant's due process challenge to CALCRIM former No. 1191 failed].) Moreover, the instruction told jurors: (1) they may not even consider the evidence unless it is proved by a preponderance of the evidence; (2) if they decide that standard is met, they "*may, but are not required to,* conclude from the evidence that the defendant was disposed or inclined to commit sexual offenses"; (3) based on that decision, they *may conclude* that the defendant was likely to commit the charged offenses (not that he did commit the charged offenses); (4) the determination the defendant committed the prior misconduct "*is only one factor to consider with all the other evidence*"; (5) the *determination the defendant committed the prior acts is* "*not sufficient by itself to prove that the defendant is guilty of*" *the charged offenses*; and (6) "[t]he People *must still prove*" the charge "*beyond a reasonable doubt*." (Italics added.) The jury was also instructed on how to consider defendant's uncharged sex offenses against M.T., how to evaluate the

29

evidence (CALCRIM No. 302 [evaluating conflicting evidence], No. 303 [limited purpose evidence in general], & No. 318 [prior statements as evidence]), and to judge the credibility of the witnesses (CALCRIM No. 226 [witnesses]). We presume the jury understood and followed these instructions. (See *People v. Silveria and Travis* (2020) 10 Cal.5th 195, 245.)

Moreover, we reject defendant's assertion that CALCRIM former No. 1191 and the prosecutor's argument allowed the jury to use M.T.'s testimony to "find him guilty of *all* the charged offenses." (Italics added.) The record belies this assertion: The jury hung on the charge of human trafficking of S.M., which was dismissed, and found him not guilty of robbing A.M.

### C. Substantial Evidence.

Defendant contends the evidence is insufficient to support his convictions of rape (§ 261, subd. (a)(2)) and human trafficking (§ 236.1, subd. (b)), as alleged in counts 3 and 4 (against A.M.). We disagree.

"In considering a challenge to the sufficiency of the evidence . . . , we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value— from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary

30

finding. [Citation.] 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.'" (*People v. Albillar* (2010) 51 Cal.4th 47, 59-60.)

      *1. Count 4 - rape - (§ 261, subd. (a)(2)).*

Rape is defined as "an act of sexual intercourse" accomplished with a person "not the spouse" of the perpetrator "against a person's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another." (§ 261, subd. (a)(1), (2).) In the context of sexual assault, "'against one's will' means 'without the consent of the alleged victim.'" (*People v. Lee* (2011) 51 Cal.4th 620, 664, fn. 10.)

Here, A.M. testified that she did not want to have sex with defendant and that no less than three times she was unsuccessful at stopping him from having sex with her. She described the first time as follows: "We were at the apartment. And I was in the living room because that's where the girls stayed was in the living room. And I was sleeping on the floor. He's touching me. And I feel like—I feel a pull on my hips, like, backwards, because I'm [lying] on my stomach. And he tells me to get up, so I get up. [¶] He tells me to take off my clothes, so I take off my clothes. And he puts on a condom, and he tells me to get on top. And I get on top of him. And I'm not enjoying it, and he knows that. And he tells me I need to calm down. I need to relax. He said, 'I need to break you in.' It was the worst." When defendant initiated sexual intercourse, she would roll over, but he would "pull [her] back." She stated that she did not try to make it stop because "[i]t was gonna happen whether or not [she] liked it. It wasn't about [her]. It wasn't about . . . intimacy. . . . It was sex for him. He needed to get off." She testified that

31

during the act she was afraid of defendant, adding that if she refused to comply "he would do it harder." Ultimately, she stopped trying to avoid having sexual intercourse with him because she was "not trying to get hit." According to defendant, A.M.'s testimony shows that she "never refused his sexual advances." He adds that there was "no physical or forensic evidence" to prove that he raped her at "some unknown date and time," there were no witnesses, A.M. never disclosed that she was raped, and a cell phone video shows that she engaged in a consensual threesome.

To prove that defendant committed rape by force, "the prosecutor was merely required to prove that the act of [rape] was accomplished by enough physical force to overcome the victim's will." (*People v. Hale* (2012) 204 Cal.App.4th 961, 979.) Rape is committed by duress where the defendant uses "'""a direct or implied threat of . . . hardship or retribution sufficient to coerce a reasonable person of ordinary sensibilities to . . . perform an act which otherwise would not have been performed . . . .'" [Citation.]' [Citations.] 'Duress can arise from various circumstances, including the relationship between the defendant and the victim and their relative ages and sizes. . . .'" (*Id*. at p. 979.) Here, the question is whether defendant used intimidation, threats, or coercion to overcome A.M.'s ability to convey her lack of consent. (See, e.g., *People v. Maury* (2003) 30 Cal.4th 342, 403; *People v. Ireland* (2010) 188 Cal.App.4th 328, 338.) The jury resolved that question against defendant. "'We do not reweigh evidence or reevaluate a witness's credibility.'" (*People v. Brown* (2014) 59 Cal.4th 86, 106.) Accordingly, sufficient evidence supports this conviction.

32

### 2. *Count 3 - human trafficking - (§ 236.1, subd. (b)).*

"'A person who deprives or violates the personal liberty of another with the intent to effect or maintain a violation of Section 266, 266h, 266i, 266j, 267, 311.1, 311.2, 311.3, 311.4, 311.5, 311.6, or 518 is guilty of human trafficking . . . .' [Citation.] "'Deprivation or violation of the personal liberty of another" includes substantial and sustained restriction of another's liberty accomplished through force, fear, fraud, deceit, coercion, violence, duress, menace, or threat of unlawful injury to the victim or to another person, under circumstances where the person receiving or apprehending the threat reasonably believes that it is likely that the person making the threat would carry it out.'" (*People v. Oliver* (2020) 54 Cal.App.5th 1084, 1095.) "When determining whether the victim's liberty was deprived or violated, and when determining whether a defendant used duress or coercion, the jury must consider '[t]he total circumstances' including a list of nonexhaustive 'factors' such as the victim's age, the relationship between the victim and his or her trafficker or the trafficker's agents, and any handicap or disability of the victim." (*Id*. at p. 1095, fn. 7.) Moreover, "the victim's consent or lack thereof is irrelevant" because "section 236.1, subdivision (h)(3)'s nonexhaustive definition of deprivation or violation of personal liberty leaves open the possibility that a victim may *agree* to have his or her freedom of movement limited by a pimp, for example, to help facilitate and share in the profits of a prostitution ring. Yet, the crime of human trafficking will still have been committed if the deprivation was done with the requisite mental state." (*Ibid*.)

33

According to defendant, he monitored A.M. to keep her safe and provided her with shelter, food, and other daily necessities; however, once she completed her assignments, she could leave. Thus, he contends the evidence fails to support his human trafficking conviction since he never deprived A.M. of, or violated her, personal liberty. However, the totality of the circumstances reveals otherwise. (*People v. Oliver*, *supra*, 54 Cal.App.5th at p. 1095, fn. 7.) A.M. was vulnerable when defendant recruited and groomed her to become a prostitute. He professed a romantic interest in her until she acquiesced to returning to a life of prostitution. At that point, defendant demanded that she hand over her social security card and birth certificate, restricted her cellular phone service, required her to remain inside the house unless he was home or there was a reason to leave, and decided whether she could cook or go out to get food. Having witnessed defendant beat his other prostitutes when they did not follow his rules, A.M. feared defendant, was scared to leave, and was afraid to talk to law enforcement for fear that she or defendant would be arrested and then she would be out "on [her] ass[]." She was told that "snitches get stitches."

From A.M.'s testimony, a jury could reasonably conclude defendant limited her freedom of movement with the specific intent of pimping her. By taking her important identification documents, constantly monitoring her, making her financially dependent on him, and using verbal and physical abuse to secure her compliance with his demand that she earn a minimum daily amount, the jury could conclude defendant trafficked A.M. (See *People v. Guyton* (2018) 20 Cal.App.5th 499, 507 [human trafficking conviction affirmed where, inter alia, the defendant isolated the victim, constantly monitored her,

34

made her work when she was exhausted, and made her financially dependent on him].)
Substantial evidence supports the jury's conclusion.

### D. Expert Testimony About the Effects of Human Trafficking on CSWs.

Over defense objection, the trial court allowed Deputy Engels to testify "as an expert as to what the various words associated with human trafficking mean." Defendant contends (1) this testimony was inappropriate because Evidence Code section 1107.5 did not apply, (2) the prosecutor committed misconduct by exceeding the court's ruling and eliciting the deputy's opinions about CSWs' mental and psychological processes, and (3) the deputy lacked qualifications to testify about CSWs' mental and psychological processes.

### 1. Further background information.

Prior to trial, the prosecution moved to admit expert testimony regarding human trafficking, pimping, and pandering, on the grounds these crimes "involve dynamics and terminology outside the scope of the average trier of fact's experience." The prosecutor argued that Evidence Code section 1107.5 allows for the admission of expert testimony "'by either the prosecution or the defense regarding the effects of human trafficking on human trafficking victims, including the nature and effect of physical, emotional, or mental abuse on the beliefs, perceptions, or behavior of human trafficking victims.'" He stated his plan "to elicit testimony on pimping, pandering and human trafficking to educate the jury on the ways in which pimps and traffickers exert control, the mental manipulation involved, payment structure, concepts of a 'bottom' and 'pimp partners,' and use terms common in commercial sexual exploitation. [He explained that t]he differing

reactions of sex victims in cases involving pimping and human trafficking are not necessarily common knowledge to lay jurors.  In addition, it is unlikely that jurors will be aware of the various trends governing the infrastructure of street-level and Internet prostitution, particularly the culture of protecting the pimp and the consequences of cooperating with law enforcement."

Defense counsel objected on the grounds the evidence lacks foundation and because he was not provided "with a statement of what this witness is expected to say," and he does not "know specifically what [the expert is] going to say, whether it's fact-specific or general."  The prosecutor noted that defense counsel was notified in April 2019 that Deputy Engels would be called as an expert on human trafficking and was provided with his resume; however, counsel never asked for clarification.  The trial court overruled defense counsel's objection but directed the prosecutor to make the expert available if counsel wished to speak to him.

In addition to defining and explaining terms used by individuals who engage in human trafficking and pimping, Deputy Engels opined on why women become prostitutes, their typical background, and why they do not leave their pimps.  On cross-examination, he acknowledged that he had testified only a few times as the prosecution's expert on human trafficking, he was not a psychologist nor a psychiatrist, his training was from the law enforcement perspective, and he assumed that CSWs and pimps spoke to him truthfully.  On redirect, he stated that his opinions were based on his "investigations, [and his] own experience."

36

*2. Analysis.*

A trial court has wide discretion to admit or exclude expert testimony. (*People v. Leonard* (2014) 228 Cal.App.4th 465, 493.) "'California law permits a person with "special knowledge, skill, experience, training, or education" in a particular field to qualify as an expert witness [citation] and to give testimony in the form of an opinion [citation].' [Citation.] An expert opinion must not be based upon speculative or conjectural data. [Citations.] An expert's opinion must be '[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.' [Citation.] 'Testimony in the form of an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact.' [Citation.] [¶] However, "'[a] witness may not express an opinion on a defendant's guilt. [Citations.] The reason for this rule is not because guilt is the ultimate issue of fact for the jury, as opinion testimony often goes to the ultimate issue. [Citations.] 'Rather, opinions on guilt or innocence are inadmissible because they are of no assistance to the trier of fact. To put it another way, the trier of fact is as competent as the witness to weigh the evidence and draw a conclusion on the issue of guilt.'"'" (*Ibid.*)

Contrary to defendant's assertion, Evidence Code section 1107.5 applies to this case. Pursuant to that statute, once "relevancy and the proper qualifications of the expert witness" are established, the prosecutor may introduce expert testimony "regarding the effects of human trafficking on human trafficking victims, including the nature and effect of physical, emotional, or mental abuse on the beliefs, perceptions, or behavior of human trafficking victims." (Evid. Code, § 1107.5, subds. (a), (b).) Here, the prosecutor

37

explained, and the trial court agreed, that expert testimony will assist the jury on understanding the terminology used in, and culture of, pimping and pandering for "commercial sexploitation." Deputy Engels' testimony did just that. We reject defendant's attempt to limit the use of such evidence to cases that only involved "an affirmative defense for sex trafficking victims." (*People v. Calhoun* (2019) 38 Cal.App.5th 275, 288-290; *People v. Leonard*, *supra*, 228 Cal.App.4th at pp. 492-494 [use of expert testimony regarding the culture of pimping and pandering, including expert's interpretation of defendant's social media postings and the victims' statements against defendant]; *U.S. v. Taylor* (9th Cir. 2001) 239 F.3d 994, 998 ["A trier of fact who is in the dark about that relationship may be unprepared to assess the veracity of an alleged pimp, prostitute, or other witness testifying about prostitution."].)

Likewise, we reject defendant's assertion that the prosecutor committed misconduct by eliciting Deputy Engels' opinions about CSWs' mental and psychological processes. More specifically, defendant challenges the prosecutor's questions concerning why women become CSWs, why CSWs do not leave their pimps, who controls the money made by CSWs, how pimps gain control over CSWs, what happens when CSWs cooperate with law enforcement, what type of women become CSWs, and why CSWs find it difficult to leave their pimps. When granting the prosecution's request to admit expert testimony on human trafficking, pimping and pandering, the trial court stated that it was allowing "the People to introduce expert testimony regarding human trafficking, [and the] pimping and pandering culture. . . . Because the Court does feel that under the nature of the charges here, human trafficking for commercial sexploitation, that an expert

would be helpful to the jury to understand exactly what it is that we're talking about." The court did not limit the scope of the expert's testimony. Its later reference to the expert testifying about "words associated with human trafficking" was in response to defense counsel's concern: "Just to be abundantly clear, while there's been reference to different terminology in police reports, no police report actually has been authored by Deputy Engels." Thus, the prosecutor did not exceed the scope of the court's ruling.

Moreover, Deputy Engels' expert opinions were based on his experience as a human trafficking investigator, including his interviews with hundreds of such women. Because expertise may come from "experience" (Evid. Code, § 720, subds. (a), (b); see *People v. Prince* (2007) 40 Cal.4th 1179, 1219-1220), and because experience may come from what one learns during interviews (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 324), Engels was qualified to offer this expert testimony. Contrary to what defendant asserts, this was not "psychological processes" testimony.

For the above reasons, we find no merit in defendant's challenges to the introduction and use of Deputy Engels' expert testimony.

*E.  Admission of Expert Testimony to Interpret Words and Analyze Data on Witness's Cell Phone.*

Defendant contends the trial court admitted irrelevant and unqualified expert testimony concerning the "meaning of statements on Fulcher's telephone" and "the location of either Fulcher and/or [defendant] based on the cell phone data."

39

## 1. Further background information.

Detective Sturdavant conducted a forensic examination of Fulcher's cell phone. He found voicemails saved under defendant's number, which was identified as "'my better half,'" and included different characters and emojis, i.e., a money bag, two fingers, and paper currency emojis. The detective explained that this contact name and the emojis mean that Fulcher associated defendant with money. A video on her phone showed her talking about life on the street[11] and about Russell being "'jealous of a green bitch'" (referring to A.M.). In a text message, Fulcher told Russell that she could have explained the situation (jealousy of A.M.) to defendant, and she would not have had to leave. In another video, Fulcher called herself a "'big old prostitute'" and asked, "'Who wants the ho low.'"[12] The detective testified that Fulcher was referring to soliciting people for prostitution, was proud to be a prostitute, and was a more experienced prostitute. The detective opined that Fulcher was defendant's most trusted woman.

Detective Sturdavant created a map using a software program, "Cell Hawk," which showed cell phone towers that defendant's and Fulcher's cell phones had used. He identified a few heavy concentration areas, including "known or established blades or tracks in the Los Angeles area" and defendant's apartment. Defense counsel objected on foundation grounds and moved to strike; however, the trial court overruled the objection and motion. The detective explained that he had obtained a "subscriber information

---

[11] The video was played for the jury.

[12] The video was played for the jury.

40

search warrant" for defendant's and Fulcher's cell phone call records, the service provider delivered information pertaining to the accounts' interaction with various cell phone towers within 100 to 1000 meters. Defense counsel again unsuccessfully objected, but the court noted a standing objection.

### 2. Analysis.

To begin with, we conclude Detective Sturdavant was qualified to provide expert testimony concerning the "meaning of statements on Fulcher's telephone" based on his investigation of 150 human trafficking cases, his 120 hours plus of advanced officer training specifically related to human trafficking and commercialized sex, and his conversations with more than 100 CSWs. (See discussion, *ante*, § II.D.2.; Evid. Code, §720; *People v. Prince*, *supra*, 40 Cal.4th at pp. 1219-1220.) However, we do not agree that he was qualified to provide expert testimony concerning the cell phone mapping. The detective explained the process of obtaining the records but failed to provide his

qualifications as an expert in analyzing these records.[13]  (*People v. Garlinger* (2016)

247 Cal.App.4th 1185, 1190-1193.)

Although the trial court erred in admitting the detective's testimony regarding

Fulcher's and defendant's locations, the error was harmless.  "'[T]he erroneous

admission of expert testimony,' including expert testimony containing inadmissible case-

specific hearsay statements, is reviewed under the *Watson*[14] standard."  (*People v. Flint*

(2018) 22 Cal.App.5th 983, 1003-1004.)  "'[U]nder *Watson*, a defendant must show it is

reasonably probable a more favorable result would have been obtained absent the error.'"

(*People v. Beltran* (2013) 56 Cal.4th 935, 955.)  "[T]he Watson test for harmless error

'focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have

done in the absence of the error under consideration.  In making that evaluation, an

appellate court may consider, among other things, whether the evidence supporting the

---

[13] The detective testified that a software program called Cell Hawk produces a map that displays "plots indicating the color matched numbers interacting with cell phone towers in various locations."  He later added that when he prepares a "subscriber information search warrant for someone's cell phone, [he is] requesting records from the service provider—such as Verizon, ATT, T-Mobile, Sprint—for any and all records associated with that account attached to a specific phone number.  In this case, [defendant's] phone number and . . . Fulcher's phone number.  [¶]  And in return, the service provider will send . . . information pertaining to that account's interaction with various cell phone towers.  Whenever somebody makes a phone call, or uses data and interacts with a cell phone tower, or triangulates with cell phone towers—so those plots—each plot represents a point in time where either [defendant] or . . . Fulcher were using their phone to either text, call, or some kind of data function, and in approximation based off triangulation of the three closest cell phone towers.  [¶]  So it doesn't give a precise GPS pinpoint location, but it's an approximation, typically, within 100 to a thousand meters.  And I use this information to show that parties are traveling together to establish that there was affiliation between [defendant] and . . . Fulcher."

[14] *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).

existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.'" (*Id*. at p. 956.)

Applying this standard, we note that evidence of Fulcher's relationship with defendant and their locations in Los Angeles and Riverside was presented through the testimony of other witnesses. Detective Sturdavant's testimony regarding cell phone mapping merely duplicated their testimony. More importantly, the prosecution presented substantial evidence demonstrating defendant's guilt, the jury was instructed on how to consider expert testimony (CALCRIM No. 332 [expert witness testimony]), and the prosecutor's closing argument did not mention cell phone mapping data. Accordingly, we reject defendant's argument that the error in admitting the detective's testimony regarding cell phone mapping was prejudicial.

### F. *The Prosecutor's Cross-Examination of Defendant's Character Witnesses.*

Defendant presented character witnesses in his defense. When cross-examining these witnesses, the prosecutor asked whether their opinion of defendant's character would change if they knew that he was involved in pimping, that women called him daddy, that he was in possession of their social security cards and driver's licenses, and that they had suffered injuries at his hands. On appeal, defendant argues his case should be reversed because the trial court deprived him of his constitutional rights to due process, a fair trial, and proof beyond a reasonable doubt by allowing the prosecutor to question his character witnesses with "highly improper and inflammatory guilt-assuming questions," which "unfairly destroyed [their] credibility and erroneously injected

43

assumptions of guilt into the fact-finding process." Acknowledging his trial counsel's failure to object, defendant argues ineffective assistance.

### 1. Further background information.

Defendant presented witnesses who testified about his good and nonviolent character. He charges the prosecutor with asking improper and inflammatory guilt assuming, hypothetical questions as follows:

### a. J.H. (the coworker)

J.H. considered defendant to be honest and nonviolent. The prosecutor asked J.H. if he knew Fulcher, if he had seen her tattoos, if he knew she called defendant "Daddy," and whether his opinion would change if he knew that defendant was involved in pimping.[15]

---

[15] "Q. Have you ever met a young woman by the name of . . . Fulcher? [¶] A. I know of her. I don't know her.

"Q. Would it change your mind as to if he has been involved in pimping—I'm going to show you what has been previously marked as People's Exhibit 9. [¶] If I told you that that's . . . Fulcher, and you see that writing on her, the tattoo? [¶] A. Uh-huh.

"Q. That says 'The Grate Life,' sir? [¶] A. I've never seen that tattoo on her, never.

"Q. Okay. And I'm just asking, would that change your opinion? [¶] A. No, it wouldn't, because I've never seen it on her.

"Q. What if I told you that she made a video, and she referred to [defendant] as 'Daddy,' and that she was a '304,' which we've learned is—you already know what that is? [¶] A. Yes, I do.

"Q. That she commits commercial sex acts for Daddy, and she referred to [defendant] as 'Daddy,' would that change your opinion possibly as to [defendant] being a pimp or not? [¶] A. No. Because I don't know, she could have been high or anything. I don't know. Drug—you know, they say drugs alters your mind. So I don't know.

"Q. Basically, is there anything I could tell you, sir, that would change your opinion about your brother? [¶] A. No."

44

b. L.R. (defendant's sister)

L.R. knew M.T. and S.M. The prosecutor asked whether she had seen M.T. injured, whether she knew her brother to be a pimp, whether she heard him called, "'H the Grate,'" whether she knew if he collected other people's identifying information, whether knowledge of Russell and Fulcher's video—made in defendant's apartment—referring to themselves as 304s would affect her opinion of him, and whether she had seen tattoos on Fulcher and pictures of defendant with "'Grate'" spelled on the bottom.[16]

---

[16] "Q. Would it surprise you if I told you that [Russell's] social security card and driver's license was found in your brother's apartment? [¶] A. I never heard nothing about social securities or nothing like that ever before. This is my first time hearing it. So it's a surprise to me because you're telling me now.

"Q. Would it surprise you if I told you that this young lady and . . . Fulcher were making a video in your brother's apartment where they were referring to themselves as 304s, which means someone that commits commercial sex acts, commonly known as, like, a prostitute? That they were 304s and that your brother was their daddy, basically their pimp? [¶] A. Never heard of any of it.

"Q. Okay. Would that kind of change your opinion on your brother? [¶] A. No. I've always known my brother to help. No, I know him helping. He's always helping people—women, man. So this, I don't know nothing about it."

"Q. Let me ask you this: Do you remember there being a domestic violence issue between your brother and [M.T.] around that time? Or did they—did no one discuss that with you? [¶] A. No one discussed that with me. Because I never heard of—never seen it. I only know about—I only seen them doing good times. I never seen her abused ever. When she was in my presence—ever—I never seen her abused."

"Q. Your brother got into the relationship with M.T. in about 2008; correct? [¶] A. I believe so. I believe so, 2008.

"Q. Okay. So he's in a relationship with her in about 2008. [¶] Would it surprise you if you learned that in 2009, 2010, M.T. was contacted for prostitution? [¶] A. No.

"Q. You didn't know about that? [¶] A. Huh-uh.

"Q. Okay. That's the first that you've heard about it? [¶] A. Yes."

45

c. A.F. (defendant's friend)

A.F. lived in defendant's apartment complex, stayed with defendant for a month in 2017, and never saw anything to suggest defendant was involved in prostitution. The prosecutor asked if he had heard defendant refer to himself as "'H the Grate,'" had ever been inside defendant's car and seen "'The Grate Life,'" or seen him wear clothing with dollar signs.[17]

d. E.H. (the ex-girlfriend)

E.H. dated defendant "about 16 years ago," he was her daughter's "godparent," and she did not consider him to be violent. The prosecutor asked if she heard his nickname to be "'H the Grate,'" saw any woman associated with him to have a tattoo that spelled, "'The Grate Life,'" knew the inside of his car was embroidered with "'The Grate

---

[17] "Q. Have you ever heard [defendant] refer to himself as 'H the Grate?' [¶] A. No sir.
    "Q. Have you ever been inside of his car and seen in the front passenger seat, it says—or on the front passenger seat, it says, 'The Grate Life?' [¶] A. No. Every time he's always been in my car. I've never been in his car.
    "Q. Okay. Showing you People's Exhibit 22, do you see this outfit on the screen? [¶] A. Yes, sir.
    "Q. Do you see these pants with the dollar signs? [¶] A. Yes, sir.
    "Q. Have you ever seen him wear that? [¶] A. No."

46

Life'" and dollar signs, or would change her opinion of his nonviolent nature if she knew a young woman suffered injuries at his hands.[18]

2. *Analysis.*

In general, evidence of someone's character is inadmissible, whether in the form of an opinion, reputation, or specific instances of conduct, to prove that person's conduct on a specific occasion. (Evid. Code, § 1101, subd. (a).) However, in criminal cases, "evidence of the defendant's character or a trait of his character in the form of an opinion or evidence of his reputation" is admissible when "[o]ffered by the defendant to prove his conduct in conformity with such character or trait of character[; or] [¶] [o]ffered by the prosecution to rebut evidence adduced by the defendant . . . ." (Evid. Code, § 1102,

---

[18] "Q. Would it surprise you—showing you . . . Exhibit 9, if a woman that's associated with [defendant] had a tattoo that's spelled 'The Grate Life,' and 'grate' is spelled the same way that I showed you in that picture? [¶] A. No.

"Q. What if I told you that he had that same 'The Grate Life' in his car in the passenger seat? It's kind of embroidered in it. Says 'The Grate Life,' and it has dollar signs. [¶] A. No, I haven't.

"Q. Okay. Now, you also said you don't know [defendant] to be a violent person? [¶] A. No, I don't.

"Q. Would it affect your opinion at all, or not, if I told you—in showing you People's Exhibit 39, that this—do you see the young woman in that picture? [¶] A. Yes, I see her.

"Q. Okay. That she suffered injuries at the hands of [defendant]. [¶] A. What is your question?

"Q. Would that change your opinion, or not, as if he's a violent person? [¶] A. No, that doesn't change my opinion. Because I've never seen him violent. I don't have an opinion.

"Q. What if I told you he admitted to being violent with her? [¶] A. It's still—to me, I never witnessed that myself.

"Q. So that wouldn't change your opinion? [¶] A. No."

47

subds. (a), (b); see Evid. Code, § 1100 [Character evidence also "include[es] evidence . . . of specific instances of such person's conduct . . . ."].)

"When a witness testifies to a defendant's good reputation, the prosecutor is entitled to ask in good faith if the witness has heard of misconduct by the defendant. [Citations.] . . . [¶] . . . When a witness offers an opinion of a defendant's good character, it is often based on personal knowledge as well as reputation.  [Citation.]  This opens the door for the prosecutor to offer rebuttal evidence of defendant's character.  [Citation.] . . . The prosecutor can test the witness's opinion by asking about his or her knowledge of the defendant's misconduct [citation], even if the witness professes ignorance."  (*People v. Lopez* (2005) 129 Cal.App.4th 1508, 1528.)  Accordingly, "'[w]hen . . . a witness is called to express an opinion as to the good character of the defendant, the prosecution must have the opportunity [under the Evidence Code] to let the jury test the validity of the opinion or the weight to be given to it by asking whether the holder of the opinion has knowledge of events or acts which have indisputably occurred.' [Citation.] . . . When such cross-examination of a good-character witness is permitted, the jury should be instructed that such questions and answers of a character witness are to be considered only for the purpose of determining the weight to be given to the opinion or testimony of the witness.'"  (*People v. Clair* (1992) 2 Cal.4th 629, 682-683.)

Nothing in Evidence Code section 1102, subdivision (b), excludes evidence of a defendant's current charged offenses from the prosecutor's ability to counter the defense's good character opinion evidence.  However, as defendant points out, federal courts have found that it is improper for a prosecutor to ask defense character witnesses

48

by using guilt assuming hypotheticals. (See *U.S. v. Shwayder* (9th Cir. 2002) 312 F.3d 1109, 1121 ["use of guilt assuming hypotheticals undermines the presumption of innocence and thus violates a defendant's right to due process"]; *U.S. v. Guzman* (11th Cir. 1999) 167 F.3d 1350, 1354 ["district court should not have allowed the government to ask [the defendant's] character witness to assume that she was guilty of the instant offense"]; *U.S. v. McGuire* (6th Cir. 1984) 744 F.2d 1197, 1204 ["It would be error to allow the prosecution to ask the character witness to assume defendant's guilt of the offenses for which he is then on trial."]; *U.S. v. Candelaria-Gonzalez* (5th Cir. 1977) 547 F.2d 291, 294; *U.S. v. Oshatz* (2d Cir. 1990) 912 F.2d 534, 539.) Yet, the federal cases finding error are inapposite.

Here, the prosecutor did not ask the witnesses to assume defendant was guilty but rather whether it would change their opinions if they heard about the accusations. In *People v. Qui Mei Lee* (1975) 48 Cal.App.3d 516, a character witness testified that the defendant was honest. (*Id*. at p. 524.) On cross-examination, the prosecutor asked whether the witness had heard of the allegations made against the defendant. (*Ibid*.) In concluding that the cross-examination was proper, the Court of Appeal observed that "the witness' testimony [was] delivered in the present tense. . . . Whatever [the defendant's] reputation might have been before the charge, after the charge it is at least dubious. Thus where the character witness nonetheless states under oath that such defendant's reputation for honesty is presently good, there is a strong suggestion (to say the least) that he is not a credible witness. And on cross-examination, such lack of credibility may be

demonstrated by asking him whether he in fact has heard of the commission of the offense for which the defendant is on trial." (*Id*. at p. 527.)

Here, defendant's character witnesses claimed ignorance about the details of what defendant was charged with, his nicknames (on his clothing, in his car, and tattooed on women he associated with), and his guilty plea to assaulting a former girlfriend (M.T.). The prosecutor, therefore, was entitled to ask if their opinions would change if they were aware of this evidence in order to test their knowledge of defendant's character. A witness' deliberate attempts to stay ignorant of the underlying facts of the case are relevant to such a test. (See *U.S. v. Oshatz*, *supra*, 912 F.2d at p. 544 (conc. opn. of Mukasey, J.) ["If the witness' judgment is distorted either by such partisanship that the witness would think highly of the defendant despite misbehavior, or by a warped ethical standard, the witness' opinion may be correspondingly discounted."].) Defendant's character witnesses testified that none of this evidence would change their opinions about defendant; their responses made them less credible witnesses.[19]

Nonetheless, defendant argues that it was not proper for the prosecutor to ask these questions because he could not have had a good faith belief that the acts took place since the jury had not found any allegations true or convicted defendant of the charges. Not so. Based on the evidence presented in his case-in-chief, the prosecutor was entitled to a "good faith belief" that the acts in question "actually happened." (See *People v. Tuggles* (2009) 179 Cal.App.4th 339, 358 ["A good faith belief by the prosecution that the acts or

---

[19] There was another reason to doubt L.R.'s impartiality—she is defendant's sister.

50

statements asked about actually happened suffices to allow questioning of the witness about their occurrence."]; *People v. Qui Mei Lee*, *supra*, 48 Cal.App.3d at p. 528 ["[L]ong before [the witness] was cross-examined as to whether he had heard of the acts mentioned by the prosecutor, the prosecutor had already placed evidence of all those acts before the jury as integral parts of the People's case."].)

Moreover, the jury was instructed with CALCRIM No. 351 (cross-examination of character witnesses), and specifically told: "The attorney for the People were allowed . . . to ask defendant's character witnesses if they had heard that the defendant engaged in certain conduct. These . . . 'have you heard' questions and their answers are not evidence that the defendant engaged in any conduct. You may consider these questions and answers only to evaluate the meaning and importance of a character witness's testimony." Similarly, the jury was told: "During the trial, certain evidence was admitted for a limited purpose. You may consider that evidence only for that purpose and no other purpose." (See CALCRIM No. 303 [limited purpose evidence in general].) Thus, "any possibility the jury might have misunderstood the purpose of this evidence was obviated by the limiting instruction, which we presume the jury understood and followed." (*People v. Panah* (2005) 35 Cal.4th 395, 492 [defense expert's opinion properly impeached by lack of knowledge of the defendant's criminal record]; see *People v. Edwards* (2013) 57 Cal.4th 658, 746 ["'We of course presume "that jurors understand and follow the court's instructions."'"].) Defendant points to nothing in the record to rebut that presumption.

We, therefore, conclude the prosecutor's brief questioning of defendant's character witnesses regarding their opinions of his character was not misconduct, and defense counsel was not deficient for failing to object.

*G. Prosecutorial Misconduct in Closing Argument.*

Defendant contends the prosecutor committed reversible misconduct in his closing argument by vouching for the victims' credibility and attacking defense counsel's integrity; alternatively, he argues his trial counsel was ineffective by failing to object to the prosecutor's argument.

*1. Further background information.*

During closing argument, the prosecutor argued that A.M., S.M., and M.T. "were asked tough questions. They were asked intimate questions. And they sat up here and told their truth." He asserted that A.M. "has no reasonable motive to lie here." He added that A.M. is "honest about how naïve she was. . . . [¶] . . . [¶] She also gave details about how she reacted [when defendant raped her]. She was very honest about that. . . . She [admitted that she did not fight it off.] No. She said what her reaction was. And she's been honest about that." According to the prosecutor, there was "no reasonable motive for [A.M.] to lie in this case" because what she said was corroborated.

In response, defense counsel argued that this case was about A.M., S.M., and M.T. "[g]etting revenge on [defendant] by making up lies and half-truths and using it to their advantage to get revenge." Regarding A.M., counsel argued that her claim that she had to sign over her $890 tax return to defendant was "a lie. That's not true. If it is true, why is she looking through a purse/folder-type thing for her legal documents? Why is she

52

looking for her tax return?  She told you she had to give that up the day she walked in there.  'I had to give him my stuff,' she said.  This proves she's lying.  She's not telling you the truth.  It's half-truths."  Regarding the charge of raping A.M., he argued the jury should find defendant not guilty.  Pointing to the instruction (CALCRIM No. 1000),[20] counsel emphasized elements three and four, and argued that she consented to the intercourse; there is no evidence that defendant accomplished the intercourse by "force, violence, duress, menace, or fear of immediate bodily injury to [her] or someone else."  He added that defendant is not guilty of rape if he "actually and reasonably believed the woman consented to the intercourse."

---

[20] CALCRIM No. 1000, in relevant part, provides:  "To prove that the defendant is guilty of this crime, the People must prove that:  [¶] 1. The defendant had sexual intercourse with a woman; [¶] 2. He and the woman were not married to each other at the time of the intercourse; [¶] 3. The woman did not consent to the intercourse; [¶] AND [¶] 4. The defendant accomplished the intercourse by; [¶] force, violence, duress, menace, or fear of immediate and unlawful bodily injury to the woman or to someone else.  [¶] OR [¶] threatening to retaliate in the future against the woman or someone else when there was a reasonable possibility that the defendant would carry out the threat.  A threat to retaliate is a threat to kidnap, falsely imprison, or inflict extreme pain, serious bodily injury, or death. [¶] . . . [¶]  Intercourse is accomplished by force if a person uses enough physical force to overcome the woman's will.  [¶]  Duress means a direct or implied threat of force, violence, danger, or retribution that would cause a reasonable person to do or submit to something that she would not do or submit to otherwise.  When deciding whether the act was accomplished by duress, consider all the circumstances, including the woman's age and her relationship to the defendant.  [¶]  Retribution is a form of payback or revenge.  [¶]  Menace means a threat, statement, or act showing an intent to injure someone.  [¶]  Intercourse is accomplished by fear if the woman is actually and reasonably afraid or she is actually but unreasonably afraid and the defendant knows of her fear and takes advantage of it.  [¶]  The defendant is not guilty of rape if he actually and reasonably believed that the woman consented to the intercourse and actually and reasonably believed that she consented throughout the act of intercourse.  The People have the burden of proving beyond a reasonable doubt that the defendant did not actually and reasonably believe that the woman consented.  If the People have not met this burden, you must find the defendant not guilty."

53

Regarding the offense of human trafficking, defense counsel pointed out that the instruction gives "more guidance about what is involved with depriving or violating another person's personal liberties. It says depriving or violating another person's personal liberties, as used here, includes substantial and sustained restriction of another person's liberty accomplished by force, fear, fraud, deceit, coercion, violence, duress, menace, or threat of unlawful-injury to the victim or to another person under circumstances in which the person receiving or perceiving the threat reasonably believes that it is likely that the person making the threat would carry it out." He then argued, "So ask yourself whether there's . . . any substantial and sustained restriction of [A.M.] in this case. There isn't. There's absolutely no substantial and sustained restriction of her freedom. It's, in fact, the opposite, the reverse. It's unrestrained freedom. Go where you want to go. Do what you want to do. . . . You're out on the street by yourself. You can walk away. . . . No one is stopping you. That element has not been proved beyond a reasonable doubt. Your verdict has to be not guilty of human trafficking." Regarding M.T.'s absence from the trial, defense counsel argued that "she didn't want to come and lie on the witness stand to you and repeat the lie she told Detective Sturdavant."

In rebuttal, the prosecutor argued that defense counsel offered "an unreliable recitation of the report. It's taking things out of context. It's just misstating the law, leaving things out, misstating testimony." The prosecutor explained, "So I want to start with the law. [Defense counsel] put up CALCRIM [No.] 1000 when he was talking about his client's belief. But he didn't talk about that paragraph right above it. Intercourse is accomplished by fear if the woman is actually and reasonably afraid or she

54

is actually but unreasonably afraid and the defendant knows of her fear and takes advantage of it. [¶] He wants you to forget that [defendant] knows that she's scared. He wants you to forget that [defendant] is the one that put her in fear. He wants to confuse the issues." He later added, "You know from [M.T.'s] interview with Detective Sturdavant that that's what he does, that he has had her recruit girls to work for him. So again, he's leaving out parts of the instructions. [¶] Another example, [CALCRIM No.] 1243,[21] the human trafficking, [defense counsel] wants to focus and use his kind of interpretation of things. So he reads this paragraph, and he says this is important. But he doesn't read you what duress is. He doesn't read you what menace is." The prosecutor argued, "This fairy-tale land of the game that [defense counsel] is trying to sell you is not the truth." He closed with, "[defendant] is guilty as charged. . . . Three women did not lie [about defendant]. They told you the truth. They exposed this man for what he is, a human trafficker, a rapist."

---

**21** CALCRIM No. 1243, in relevant part, provides: [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant either deprived another person of personal liberty or violated that other person's personal liberty; [¶] AND [¶] 2. When the defendant acted, he intended to commit or maintain a violation of PC 266h and PC 266i. [¶] Depriving or violating another person's personal liberty, as used here, includes substantial and sustained restriction of another person's liberty accomplished through force, fear, fraud, deceit, coercion, violence, duress, menace, or threat of unlawful injury to the victim or to another person under circumstances in which the person receiving or perceiving the threat reasonably believes that it is likely that the person making the threat would carry it out. [¶] Duress means a direct or implied threat of force, violence, danger, hardship, or retribution that is enough to cause a reasonable person to do or submit to something that he or she would not otherwise do or submit to. [¶] Violence means using physical force that is greater than the force reasonably necessary to restrain someone. [¶] Menace means a verbal or physical threat of harm, including use of a deadly weapon. The threat of harm may be express or implied."

Defense counsel did not object to any of the prosecutor's argument.

        *2. Analysis.*

"'"'[A] prosecutor is given wide latitude to vigorously argue his or her case'"' [citation] and '"may make 'assurances regarding the apparent honesty or reliability of' a witness 'based on the "facts of [the] record and the inferences reasonably drawn therefrom."'"' [Citation.] 'Improper vouching occurs when the prosecutor either (1) suggests that evidence not available to the jury supports the argument, or (2) invokes his or her personal prestige or depth of experience, or the prestige or reputation of the office, in support of the argument.' [Citation.] Referring to facts not in evidence is 'clearly' misconduct 'because such statements "tend[] to make the prosecutor his own witness—offering unsworn testimony not subject to cross-examination. It has been recognized that such testimony, 'although worthless as a matter of law, can be "dynamite" to the jury because of the special regard the jury has for the prosecutor, thereby effectively circumventing the rules of evidence.' [Citations.]" [Citations.] "Statements of supposed facts not in evidence . . . are a highly prejudicial form of misconduct, and a frequent basis for reversal."' [Citation.] We 'view the statements in the context of the argument as a whole.'" (*People v. Rodriguez* (2020) 9 Cal.5th 474, 480.)

        Here, the prosecutor's assertion that A.M. "has no reasonable motive to lie here" was proper because it did not "suggest the prosecutor had personal knowledge of facts outside the record showing [A.M.] was telling the truth" or "invite[] the jury to abdicate its responsibility to independently evaluate for itself whether [A.M.] should be believed."

56

(*People v. Bonilla* (2007) 41 Cal.4th 313, 337-338.)  Likewise, the reference to her being honest about her reaction to the rape was proper because it was based on the record, i.e., A.M. admitted that she did not try to stop defendant and she acted as if she enjoyed it, even though she did not want to have intercourse with defendant, and she did not enjoy it. We do not find these statements to constitute improper prosecutorial vouching.  However, we cannot say the same about the prosecutor's statements during rebuttal—the three women "did not lie" but "told you the truth"—and in reply to defense counsel's argument that the women made up lies and half-truths to get revenge on defendant, and M.T. refused to testify in person because she did not want to "lie on the witness stand."

An argument constitutes vouching if it bolsters a witness's credibility by relying on matter outside the record, matter the jury might improperly accept based solely on the prestige and authority of the prosecutor's office.  Here, the challenged statements were in response to defense counsel's argument that all three women were liars out for revenge. However, defense counsel does not open the door for prosecutorial vouching every time he or she argues that a prosecution witness's testimony is not to be believed.  Also, it is unclear what matter the prosecutor was relying on when making these statements.  Thus, arguably, these statements by the prosecutor—the three women "did not lie" but "told you the truth"—constitute impermissible vouching.

Finally, defendant contends that the prosecutor impugned the integrity of defense counsel by "unjustifiably intimating that he breached his ethical obligations, instructed the jury to disregard the law, and informed the jury to follow his own version of the law." We agree the prosecutor could properly point out that defense counsel tailored his

57

discussion of the applicable jury instructions to support his narrative for finding the defendant not guilty by leaving out parts of the instruction that prejudiced the case. However, it was not proper for the prosecutor to argue that defense counsel was "just misstating the law, leaving things out, misstating testimony."

Although we have found prosecutorial error, we find the error harmless. "Error with respect to prosecutorial misconduct is evaluated under *Chapman v. California* (1967) 386 U.S. 18 . . . to the extent federal constitutional rights are implicated, and [*Watson*, *supra*,] 46 Cal.2d 818 . . . , if only state law issues were involved. [Citation.] *Chapman* is implicated if the prosecutor's conduct renders the trial so fundamentally unfair that due process is violated. [Citations.] *Watson* applies where the prosecutor uses ""'deceptive or reprehensible methods to attempt to persuade either the court or the jury.'"" [Citation.]

"We find that, even if the prosecutor's argument constituted misconduct, it did not render the trial so fundamentally unfair that it triggered the *Chapman* standard. Nor is it reasonably probable that a more favorable result would have been reached absent the alleged objectionable argument. Reversal is neither warranted nor appropriate." (*People v. Fernandez* (2013) 216 Cal.App.4th 540, 564.) The jurors heard credible and substantial evidence against defendant. Moreover, they were admonished that nothing the attorneys say is evidence, which was defined as "the sworn testimony of witnesses, the exhibits admitted into evidence, and anything else [the judge] told [jurors] to consider as evidence." (See CALCRIM No. 222 [evidence].) It is not reasonably probable that

defendant would have achieved a more favorable outcome had the prosecutor not made his improper argument.

### H. CALCRIM No. 1190

Defendant contends CALCRIM No. 1190 "deprived [him] of due process and a fair trial by unfairly pinpointing the accusers' testimony" and "lower[ing] the prosecution's burden of proof."

#### 1. Further background information.

At trial, the court instructed the jury with both CALCRIM Nos. 301 and 1190. CALCRIM No. 301 instructed: "The testimony of only one witness can prove any fact. Before you conclude that the testimony of one witness proves a fact, you should carefully review all the evidence." And, CALCRIM No. 1190 instructed: "[C]onviction of a sexual assault crime may be based on the testimony of a complaining witness alone." Defense counsel did not object to CALCRIM No. 1190.

#### 2. Analysis.

Defendant argues that CALCRIM No. 1190, in combination with CALCRIM No. 301, "created an unconstitutional 'imbalance' in favor of the prosecution" by informing the jury that they could "convict solely upon the testimony of the accuser in a sex offense case," regardless of the other evidence. Nevertheless, he acknowledges that the California Supreme Court rejected an identical argument. (*People v. Gammage* (1992) 2 Cal.4th 693, 700-702.) In that case, the Supreme Court stated: "[CALCRIM No. 301] focuses on how the jury should evaluate a fact (or at least a fact required to be established by the prosecution) proved solely by the testimony of a single witness. It is

59

given with other instructions advising the jury how to engage in the fact-finding process. [CALCRIM No. 1190], on the other hand, declares a substantive rule of law, that the testimony of the complaining witness need not be corroborated.  It is given with other instructions on the legal elements of the charged crimes."  (*Id.* at pp. 700-701.) "[CALCRIM No. 301] merely suggests careful review when a fact depends on the testimony of one witness.  [CALCRIM No. 1190] tells the jury there is no legal corroboration requirement.  Neither eviscerates or modifies the other."[22]  (*Id.* at p. 701.)

The People argue that *People v. Gammage*, *supra*, 2 Cal.4th 693, "disposes of appellant's claim of error and is binding on this court."  We agree.  (See *Auto Equity Sales*, *Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 ["Courts exercising inferior jurisdiction must accept the law declared by courts of superior jurisdiction."]; see also *People v. Cromp* (2007) 153 Cal.App.4th 476, 480 [rejecting constitutional challenge to CALCRIM instruction based on California Supreme Court's approval of materially similar CALJIC instruction].)  Accordingly, we find no violation of defendant's rights to due process and a fair trial.

---

[22]  We have used brackets to substitute the current instructions, CALCRIM No. 301 and CALCRIM No. 1190, for their predecessors, CALJIC No. 2.27 and CALJIC No. 10.60, respectively.

*I. Cumulative Error Doctrine.*

Because we have rejected defendant's claims of prejudicial error,[23] "'we likewise conclude that the cumulative effect of these asserted errors was not prejudicial and does not require reversal.'" (See *People v. Byers* (2021) 61 Cal.App.5th 447, 460.)

### III. DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
                                                                                        J.

We concur:

RAMIREZ
                        P. J.

SLOUGH
                J.

---

**23** Although the trial court erred in admitting Detective Sturdavant's testimony regarding cell phone mapping evidence, and the prosecutor erred in the closing argument, these errors were not prejudicial.